The next case on the calendar is Adginc v. Plaza Good morning, your honors. May it please the court. My name is Brett Herman of Schlachter and Associates, and we are the attorneys for the defendant appellant, Plaza Automall, Ltd. We respectfully submit that the district court erroneously granted summary judgment in this case on three major issues. The first one being whether the monthly rent in the sublease was modified and or waived pursuant to the sublease for several months, almost a year, each and every month. The second one is whether the sole purpose of the sublease was completely frustrated or rendered commercially impractical to perform. And then the third issue is whether plaintiff fraudulently induced the defendant into the sublease at issue, rendering it null and void. We submit that the evidence on these issues in the record, both documentary and testimonial, at the very least establishes genuine issues of material fact for trial, and not at the summary judgment stage, especially when the evidence is required to be viewed in the light most favorable to our client, Plaza Automall. As to the modification and waiver, the sublease specifically allows for modification of its terms. In Section 27.07, the sublease also allows for waiver of a term contained in the sublease in Section 13i, where it says the failure of the landlord to insist upon strict performance would not be considered a waiver unless the contrary is expressed in writing by the landlord. In this case, after the signing of the sublease in November of 2012, which contained the monthly rent of $134,000, the plaintiff sent Plaza monthly invoices for the next nine months, each and every month, for total rent of $92,000 for each of those months. Each invoice- The modification, correct me if I'm misremembering the record. The modification provision says no modification shall be valid unless evidenced by an agreement in writing. So it's your contention that the invoice constituted compliance with that provision? Yeah. Well, it's not just the invoice, but the invoice affected as an offer. And the payment of those invoices, the full payment, the timely payment of those invoices, was an acceptance of that offer. And so the combination of that is an agreement, and the invoice suffices for the writing part of it. And that's according to the plain language of the sublease. It doesn't- What's interesting and important is that in a lot of these agreements, the modification has to be signed. In this case, it does not. It does not have to be by an executed instrument. And New York case law is well settled that the issues of whether the parties modified the sublease and whether they waived the rent in the sublease are issues of fact. The evidence in the case in the record shows that the modification was not a coincidence or a mistake. The circumstances indicate that the parties did, in fact, intend to modify the monthly rent for the period of time that they did. First, the plaintiff had not yet been able to provide the additional promised business to defendant to offset the significant increase in rent. The second piece of evidence is that in August 2013, there was a draft of an invoice for $741,000 in change, representing the difference in rent for the months which were modified. But this invoice- The months beginning in April, the retroactive payments. Correct. It included the retroactive payments as well. But this invoice was just part of a restructuring plan that they were going to present to Plaza. There's no evidence in the record that the invoice was sent to Plaza or that Plaza received it. And the witnesses for both sides testified as to that. There's evidence in the record that they weren't going to mail it like a regular invoice. They were going to present it in person because there were issues about what we were going to do going forward, what the parties were going to do going forward. In fact, the plan of which the invoice was attached, the restructuring plan, was going to reduce the monthly rent to $54,000 a month. And so the $741,000 was never really considered due in owing at any point until the demand in May of 2014. Perhaps most significantly, the most significant piece of evidence about the modification is that after this, quote, mistake was discovered, that the invoices were generated, and after the $741,000 draft of invoice was created, on September 26, 2013, plaintiff's own controller admitted that Plaza only currently owes $92,000 for one month's rent. That in and of itself shows that they didn't consider the back month rent due in owing at that point. In its opinion, the district court erroneously referred to acceptance, mere acceptance of partial payments of rent. The invoices indicate that that was total rent, not just mere acceptance. And the invoices were affirmative acts by the plaintiff to show that they wanted to modify the rent and that they intended to modify the rent, and we believe the district court erred in it. Didn't your client pay the new rent when the new rent started to be invoiced from October 2013 through December? Correct. He paid the new rent. Right, because at that point in time, what happened was in August, it was determined that there was no way that the ability to obtain insurance was going to be able to get insurance. It was going to happen. And so at that point, everyone gave up on the project, and they started billing. The plaintiff said, well, just bill them the full amount. In addition, at that point, the parties had discussed the issue, and there's evidence in the record again, that they said there was change in ownership that was happening, that the company was in bankruptcy. And they said, please pay the full amount, and we will, in good faith, pay the full amount, and we'll make a deal going forward. And so our side, the defendant said, okay, we'll pay the full amount, but we want to make this new deal, and we're going to credit whatever we pay on the new deal. But the lease was never explicitly modified, right? I mean, the lease itself. You're arguing that the invoices and invoice amounts effectively modified the lease. For those months, correct. And so the last monthly invoice for $92,000 was for September. So going forward after that, the lease was not modified. It was only modified for the months prior to October 2013. It was effectively modified. Is there any indication on the invoices themselves that that was the intention? Yes. The indication is the circumstances surrounding the transaction, in that they had promised additional business that they had not yet gotten, and they also hadn't obtained insurance. And so it was an issue as to what was going to happen with this going forward, because the plaintiff was there as an auto business to import autos, and if they weren't able to get insurance going forward, the ground lease was going to be rendered null and void, and the sublease just made little sense. In fact, in our frustration of purpose and commercial impracticability arguments, the courts indicate, use the term commercial senselessness. And so it would have been commercially senseless for the ground lease and for the sublease to store thousands of cars on the premises without having the ability to obtain insurance, and this was not foreseeable when they signed the sublease. They signed the sublease two weeks after Hurricane Sandy? Correct. What was unforeseeable? The unforeseeable was that there was inability to obtain insurance. It was foreseeable that the premiums might go up. It was foreseeable that there might be required a separate flood insurance, but it was not foreseeable that they would not be able to get insurance altogether. And evidence of that, and you could ask the same for the plaintiff. Why did they sign the sublease two weeks after Sandy? Because the ground lease, the sublease requires insurance. If they wanted to guard against the inability to get insurance, they would have put it in the sublease. There's nothing in the sublease that guards against the inability to get insurance. I see my time is up. As to the rest of the arguments, I'll stand by my brief. Thank you. Hi. Good morning, Your Honors. May it please the Court. My name is Christina Boss-Seaton, and I am with Fisher-Broyles LLP, representing the appellee respondent, AXGE, Inc. I'd first like to point out that this sublease contained a waiver of all defenses provision in Section 13E, which stated that tenant waived any and all defenses that tenant may have in any action brought by the landlord for default possession or failure to pay rent or additional rent. And I'd also like to point out the New York Court of Appeals precedent in Madison Avenue leasehold versus Madison-Bentley. When you are interpreting a contract such as a commercial lease, where the parties have sent down their agreement in a clear and complete document, that writing should be enforced according to its terms, and that is particularly important in the context of real property transactions where commercial certainty is of paramount concern and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length. Mr. Harmon spent a lot of time today telling us that the invoices themselves constituted the modification. That's contrary to the party's intent as expressed within the lease, and it's also contrary to the party's conduct. The sublease itself in Section 27.07 says there's no modification or amendment unless the agreement is evidenced by an agreement in writing. And Section 13i also states that there is no payment of an amount less than due from tenant to landlord shall be deemed to be anything other than payment by account. And that actually, Mr. Harmon sort of summarized that provision, but it goes on to say unless the agreement is modified in writing as well. So even within the non-waiver provision, they express that the non-waiver provision has to be modified specifically in writing. And we submit that the invoices would not be sufficient to affect that means. Can I ask you to address the question of the interest, the award of interest here? Because it seems to me there may be a question of fact as to estoppel or waiver with regard to that, because as I look at the record, it seems to me there's evidence that clients, your client offered Plaza some reassurances after it came to understand its mistake, it hadn't been charging the back rent, and assured Plaza they would work something out during this period where they're negotiating. Why wouldn't that raise a question as to estoppel? Well, the agreement is plain on its face. The amounts become due on the first day of every month. That's in the sublease 3.01. The client was not invoicing for those amounts. It was invoicing for a lower amount. That's correct, but the lease specifically provides that any payments on account or any amounts less than that are sufficient. So it's our position that the invoices here don't control. It's the document itself, and there was no expression between the parties that the invoices would modify that agreement. But then over a lengthy period, you keep invoicing at the lower rent. You raise the rent. You don't invoice. They pay off what's invoiced each month. I'm just pointing. There's evidence in the record that when the error is recognized and the parties start negotiating, that there were assurances made we'll work something out. During that period, is it reasonable to say that Plaza should still be paying interest on the amounts that had not been earlier paid? So it's our position that it is in the entire context of this transaction. This document is an incredibly landlord-friendly document that simply is just where the facts lie. I mean, there are, in addition to the two provisions that we've discussed, there's also, in addition, the high water provision that we have in 25.01 where the tenant assumes all financial risks. That would counsel in favor of a strict reading of the agreement. In fact, there's a provision in 25.01c that says the high water provision was to the essence of the lease. It was special consideration for the landlord to enter into that lease. There's also a no offsets position in Article 21. And even above and beyond those in Article 16, in the inability to perform provision, the landlord is not obligated to perform the conditions underneath the lease, even according to a long list of enumerated force majeure type obligations. So the context of this agreement is that the lease is to be filed specifically according to its terms, even when it is unfair and unequivocal to Plaza Auto Mall. And I think especially in the context of this case where, as Judge Kearse pointed out, it was signed two weeks after Hurricane Sandy, this harm, to the extent that there was harm, was entirely foreseeable. I'd like to touch just very briefly, if I can, upon the impossibility arguments. The district court relied upon, well, the commercial impracticability and frustration of purpose doctrines, again, are barred by the waiver of all defenses in Article 13E. But with regards to impossibility, the district court relied upon Cal Kim Court versus Central Markets. It pointed out that that case was directly on point. That case is almost directly on point, because in that case, the lease did provide that the tenant had to have commercial general liability insurance. Here, the obligation for flood insurance is not part of the sublease. It's not part of the ground lease. That was imposed on Plaza in third parties' contracts. They're not part of our contracts in our business relationship, and that's in the record at A368 in the transcript lines 8011 through 17. But the legal argument for impossibility, you have to show that it was objectively impossible and that it could not have been foreseen. We've discussed about foreseeability, all these provisions in the contract, the allocated risk in addition to Hurricane Sandy. But in addition, it was not objectively impossible. The essence of this agreement was to store cars. They continued to store cars there after they lost the ability to have flood insurance. So effectively, for a period of time, they were having their cake and eating it too. They were not paying expensive money for flood insurance, and they weren't paying their rent. Just very briefly on the fraudulent inducement claim, the district court held that Plaza was not able to make out the second element, that nexus between the alleged promise, even assuming there was a promise, there was no nexus between that promise and the entering into the sublease. And there's a long line of Second Circuit precedent that holds that if you are aware of terms that are material to your agreements, they need to be embodied into the agreement. One of those is emergent capital investment management versus Stonepath Group. That was a 2003 case. The district court also correctly held that there was no justifiable reliance in this case. Plaza was a sophisticated party. I'm sure you hear their ads on television all the time. They're one of the largest car dealerships, not only in the New York City area, but also in the country. They were represented by their longtime counsel. The agreement contained a merger provision that has, we believe, specific disclaimer language in it in Section 27.07. In addition, the aspects of the deal that they claimed that they were misled about, that they were definitely going to get this work, that work was always speculative. The vehicle processing work didn't exist at that time. It turned out that it never materialized. The port was never able to become a functional auto delivery court. And they knew that just as well as we did, and we can prove it because- There's no evidence that your client even had any agreements with manufacturers to deliver vehicles. They were never able to enter into those agreements. And Plaza knew that because there was a bid that was put out that stated that if there is this work, we will be taking bids in order to get this work, and the bid was part of Axis trying to go out and bid to get the work into the port. The bid on its face said that it was non-exclusive, and it was reviewed by their attorneys. So there's no reliance that could possibly be found in that situation. In addition, we just think that the district court also could have relied upon Scienter. In New York and in the Second Circuit, fraudulent intent is not demonstrated by evidence of a mere non-performance of a promise. This is more akin to a case where a party is expressing future expectations, that they hope that this work will materialize, but in fact it did not. And obviously all the parties hoped that this business venture would work out, but nobody went into it hoping that it would be an effective port. I think as to all the other points, at this point we'll just rely upon our brief. Thank you. Thank you. I will try to hit on a few of those points. As to the late charges and interest, Your Honor was correct in that issue, in that another piece of evidence on that is that the $741,000 invoice didn't even include late charges or interest. They could have put that on there, and they didn't. So they didn't, at that point, not until May of 2014, think that interest or late charges were due. It's your position that interest should only have been due from May 8th when the demand is first, May 8th, 2014. Correct, interest and late charges. Correct, yes. As to the waiver, waiver does not, in the sublease it indicates a waiver doesn't apply to modification, and the case law indicates that as well. So if there was an effective modification or an affirmative act, and none of those waiver clauses include an affirmative act on behalf of the plaintiff, which they did, so those cases don't apply, or the waiver doesn't apply. As to the hell or high water provision, plaintiff keeps trying to utilize that, but there is no such provision in this agreement. In the cases they cite, the hell or high water provision indicates that the payment of rent should be absolute and unconditional, and there's no hell or high water provision in this agreement, no matter how they try to bootstrap it into the other provisions. As to the frustration of purpose and commercial impracticability, the sole permitted purpose of this sublease was to store and process cars at the premises. For those defenses, courts have indicated that if the transaction makes little sense, or if it's commercially senseless, then those defenses apply. In many of the cases cited by the plaintiff, it's personal to the person who's trying to get out of the contract. Doesn't Kel Kim Corp. present a big problem for your argument? No. We present in our brief several reasons why Kel Kim does not apply. I see my time is running, but I'll answer your question briefly. The Kel Kim case was not limited to a particular purpose. The lease there was not limited to a particular purpose, so they could have used the premises for another purpose, they could have gotten insurance for another purpose, and they ruled that it was personal to it, that they made the decision not to do so was one they elected to make, not to use it for another purpose. In Kel Kim, the court nullified the lease. In Kel Kim, they were able to get the insurance at some point. Here, it was never able to be obtained. And lastly, if I may, as to the reliance in the fraudulent inducement, the court referred to the merger clause, the district court, and the court actually erroneously used the merger clause as a reason for granting summary judgment, despite the fact that they said the broad merger clause in the sublease suggests it's a general merger clause, and under New York law, a general merger clause does not bar a claim of fraudulent inducement, and so therefore they incorrectly used that merger clause. Thank you. Thank you both. Well argued. Thank you.